# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                )
DAGOBERTO SANCHEZ,                               )
                                                )
      **Petitioner,**                         )
                                                )     **Civil Action No.**
      **v.**                                 )     **12-10931-FDS**
                                                )
GARY RODEN,                                      )
                                                )
      **Respondent.**                         )
_____)

## MEMORANDUM AND ORDER ON
## PETITION FOR A WRIT OF HABEAS CORPUS

**SAYLOR, J.**

      This is an action by a state prisoner seeking a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  Petitioner Dagoberto Sanchez was convicted in Suffolk County of second-degree murder

and unlawful possession of a firearm.  He was sentenced to a term of life imprisonment (with the

possibility of parole after 15 years) on the murder conviction and a concurrent two-year term on

the firearm conviction.  Sanchez now seeks habeas relief, contending that the prosecution

deliberately exercised peremptory challenges to strike young men on the basis of race in violation

of his constitutional rights.

      For the reasons set forth below, the petition will be denied.

## I.    Background

### A.    Procedural Background

      This matter is on remand from the Court of Appeals.  Petitioner initially sought a writ of

habeas corpus in this Court, alleging that the Commonwealth impermissibly exercised multiple

peremptory challenges on the basis of race.  On appeal from this Court's denial of the petition, the

Court of Appeals found that petitioner had made out a *prima face* case of discrimination. *Sanchez v. Roden*, 753 F.3d at 307. Specifically, it held that petitioner had satisfied his burden under *Batson v. Kentucky* in raising an inference of possible racial discrimination in the prosecution's exercise of a peremptory challenge against juror 261, an African-American male. *Id.*; *see Batson v. Kentucky*, 476 U.S. 79 (1986).[1] It directed the Court to conduct an evidentiary hearing and complete the inquiry under *Batson*. *Sanchez*, 753 F.3d at 308 (1st Cir. 2014); *see Batson*, 476 U.S. 79. Specifically, it directed as follows:

> [The district] court should attempt to conduct the second and third *Batson* steps. It should require the prosecutor to explain his challenge[]. If the prosecutor offers a race-neutral explanation, the court must try to evaluate that explanation and decide whether defendant has proved purposeful racial discrimination. If the court finds that, due to the passage of time or any other reason, it cannot adequately address the issues at this stage or make a reliable determination, or if it determines that the prosecutor exercised his peremptory challenges improperly, it should set the case for a new trial. If it finds the prosecutor exercised his peremptory challenge[] in a permissible fashion, it should [affirm] the judgment.

*Sanchez v. Roden*, 753 F.3d at 308 (alteration in original) (quoting *People v. Johnson*, 136 P.3d 804 (Cal. 2006)).

On September 8, 2014, the Court held an evidentiary hearing. The only witness at the hearing was Suffolk County Assistant District Attorney Mark Lee, who was the lead prosecutor at Sanchez's trial.

**B.     Factual Background**

Unless otherwise stated, the following facts are taken from transcripts and juror questionnaires from Sanchez's trial or Lee's testimony at the September 8, 2014 hearing.

---

[1] The court also found that Sanchez had waived any objection to the challenges uses against other jurors, including jurors 201 and 227, by failing to object to those challenges at the time they were made. *Sanchez*, 753 F.3d at 295 n.10.

2

The facts surrounding the crime that led to Sanchez's conviction are set out in the decision of the Massachusetts Appeals Court on the his direct appeal, and only the facts that are relevant to this opinion bear repetition. *See Commonwealth v. Sanchez*, 79 Mass. App. Ct. 189 (2011).

Dagoberto Sanchez was charged with second-degree murder and unlawful possession of a firearm. *Commonwealth v. Sanchez*, 79 Mass. App. Ct. 189, 189 (2011). Sanchez contended that he had acted in self-defense and in the defense of another. *Id.*

Jury empanelment for the trial began on September 25, 2006. Judge Thomas E. Connolly of the Massachusetts Superior Court was the presiding judge. Prior to the voir dire, the prosecution and defense were given copies of one-page written questionnaires that had been completed by each prospective juror. The juror questionnaires included basic information such as the juror's name, age, city or town of residence, marital status, occupation, spouse's occupation, and whether the juror had children. The questionnaires also included three or four discrete questions concerning a juror's past experiences with, and connections to, the criminal justice system.

Assistant District Attorney Mark Lee was the chief prosecutor for the Commonwealth. Lee testified that once he receives the questionnaires, it is his practice, "at least as is practicable, to look through every questionnaire and make sort of a preliminary indication." (E.R. at 10). Lee explained that he looks at these questionnaires before the judge calls the court to order and during any preliminary remarks. (E.R. at 11). More specifically, he testified that "almost the first demographic I look at on that questionnaire is the age of the individual." (E.R. at 30).

Judge Connolly began the empanelment process with a series of questions to the entire venire that were intended to address possible biases. (Tr. Sep. 25, 2006 at 64-82). Once that voir

dire was completed, jurors were brought forward one by one, in ascending numerical order, and examined individually. Judge Connolly then either excused the juror for cause or determined that no such cause existed. If the juror was not excused for cause, the judge gave both attorneys an opportunity to exercise a peremptory challenge. The prosecution and the defense were granted 16 challenges each. The prosecutor was always asked for his decision first; if the prosecutor did not exercise a challenge, defense counsel was then given an opportunity to do so. If both sides chose not to exercise a challenge, the juror was immediately seated and there was no further opportunity to strike the juror.

Lee testified that during such a process, it is his practice to "always monitor[] how many peremptory challenges [he has] left versus how many peremptory challenges defense counsel has left" and also to consider "what [he] understand[s] to be upcoming based upon the questionnaires." (E.R. at 15). If a juror questionnaire includes a response that concerns him, it is his practice to ask the judge to follow up on that response. (E.R. at 28-29). He also testified that he challenges young jurors "as a general practice." (E.R. at 28).

Lee exercised his fifth peremptory challenge on juror 201, a 25-year-old male named L.D.[2] L.D. indicated on his questionnaire that he was born in Trinidad. (E.R. at 14, 33; S.A. at 281). His race is not clearly indicated in the record, although he appears to have been dark-skinned. The questionnaire further indicated that he was employed part-time as a computer technician. (S.A. at 281). The only other pieces of information on the questionnaire were his address and that he was single with no children. (*Id.*). He responded in the negative to all of the judge's inquiries as to

_____

[2] Lee's first four challenges were exercised on jurors 174, 183, 192, and 193. (Tr. Sep. 25, 2006 at 131-35, 145-49, 152-56, 156-59). The questionnaires filled out by these jurors are not part of the record, and these challenges do not appear to be directly relevant to the *Batson* analysis. The same applies to the challenges exercised by Lee on jurors 223, 237, 241, 284, and 310. (Tr. Sep. 26, 2006 at 6-10, 39-46, 49-53, 147-50, 180-85).

whether he would have any difficulty being a fair and impartial juror.  (Tr. Sep. 25, 2006 at 165-70).  Lee testified that he challenged L.D. due to his age.  (E.R. at 14).

Lee exercised his seventh challenge on juror 227, a 24-year-old black male named P.M. (E.R. at 14, 36, 38; S.A. at 282).  P.M. indicated on his questionnaire that he was an employee of City Year Inc. in Boston and that his highest academic degree was a G.E.D.  (S.A. at 282).  He also disclosed that he had once been arrested for a "[t]raffic violation that went unpaid."  (*Id.*).  He responded in the negative to all of the judge's inquiries as to whether he would have any difficulty being a fair and impartial juror.  (Tr. Sep. 26, 2006 at 13-16).  Lee testified that he challenged P.M. due to his age.  (E.R. at 14-15, 37).

Lee exercised his eighth challenge on juror 229, a white male named R.C. who was a sophomore at Boston University.  (E.R. at 38-39).  His exact age is not reflected in the record, but presumably he was approximately 19 years old.  R.C. responded in the negative to all of the judge's inquiries as to whether he would have any difficulty being a fair and impartial juror.  (Tr. Sep. 26, 2006 at 19-23).  Lee could not specifically recall his reasoning behind challenging R.C.; however, he testified that based on his general practice, he believes he challenged R.C. "because he was in college and because of his age."  (E.R. at 38).  He further testified that he "could tell you with almost 100 percent certainty if he was in college and he was young, I was going to strike him, and I did strike him."  (E.R. at 38-39).

Lee did not challenge juror 243, a 21-year-old white male of Russian descent named I.R. (E.R. at 43; S.A. at 293).  I.R.'s questionnaire specifically indicated that he had been born in Moscow, Russia.  (S.A. at 293).  It further indicated that he was a student at Boston University and that he worked part-time for a non-profit organization.  (*Id.*).  Lee testified that he did not

challenge I.R., "despite not wanting to take him," in part because he was "running out of

challenges at that point," in part due to some of I.R.'s characteristics that "barely" overcame his

youth, and in part "based upon an examination of who remained in the venire." (E.R. at 13, 43,

45). Lee specifically testified:

> I took him, despite not wanting to take him, but I was—there are a number of young jurors who I will take based upon what I consider to be indications on their questionnaire that might make them to school to fit their chronological age, which is to say that he was 21 years old, but I noted he was born in Moscow, I noted that he came here on his own to begin his own education, and so I thought if I had to take a young juror, that would be somebody who might be a better candidate than most.

(E.R. at 13). He further explained that his "inclination was to strike him":

> It was more of a hold-your-nose situation and take him because I thought somebody who came to this country to go to school at the age of 21 may have been chronologically a little bit older than someone else in terms of life experiences, and that's really what I'm looking at that somebody who has some level of maturity and life experience.

(E.R. at 44). He later clarified that "[I] didn't mean that I knew his life history. I knew he was 21,

and I knew that he was here attending school and he was born in another country." At the time,

Lee had six challenges remaining and defense counsel had twelve. (E.R. at 45). When defense

counsel also chose not to challenge I.R., he became the ninth juror seated.

Lee exercised his eleventh challenge on juror 246, a 41-year-old man born in Guatemala

named M.C. (E.R. at 52-53; S.A. at 283). During his individual voir dire, M.C. responded to a

portion of Judge Connolly's questioning as follows:

> Q    Is there any reason you can think of that you, as a juror, might not be able to be fair and impartial to the Commonwealth and to the defendant, Mr. Sanchez, and to decide this case solely on the law and the evidence as given in this case?

> A    I hope I could be fair.

> Q    Well, is there any question in your mind whether you could be fair?

| | |
|---|---|
| A | No. |
| Q | Consciously? |
| A | Just that the responsibility—I mean, no, no. |
| Q | There isn't? |
| A | No. |

(Tr. Sep. 26, 2006 at 73-74). At sidebar, Lee asked Judge Connolly to inquire further on that subject, because Lee was "concerned about whether he's daunted at the responsibility of returning a verdict in this case." (*Id.* at 74). That led to the following exchange between Judge Connolly and M.C.:

| | |
|---|---|
| Q | Sir; in response to one of my questions you indicated concerning the responsibility; something like that, do you remember that? |
| A | You said do you feel like you can do a good job, so at the end—I understood the—So what I understood as, in terms of judging somebody, do you have anything that would make you believe you can do a fair job; but the way I see it is, what makes you believe you can do a good job? Or to anybody, I guess, so it's more after— |
| Q | Let me back up a little bit. Your job, as a juror, is to follow the law as I instruct you and to decide the questions of fact that are presented to the jury, and you're asked to do the best you can after you've observed and heard and examined the exhibits, you're asked to do the best you can. No one can ask any human being to do better than they can; that's all anyone can ask of us, do you have any problems with that? |
| A | No, given that I agree; I think too. |

(*Id.* at 75). After that exchange, Lee exercised a challenge on M.C.

At the hearing on September 8, 2014, Lee testified: "I exercised a challenge against [M.C.] because in response to one of the questions, he expressed concern about the responsibility of being a juror. That is, what I consider—what he suggested was an overwhelming responsibility or a

responsibility that he didn't know whether he could meet." (E.R. at 53). Lee was then asked the following question and gave the following response:

> Q        Is it your testimony that every time some juror expressed a concern about the weight of the responsibility that you would challenge them?
>
> A        Every single time, no, but probably most times. If somebody came up there and said, I'm concerned about the level of responsibility that being a juror entails, having anybody agree unanimously on a first-degree murder conviction is extraordinarily difficult, and anybody who expresses doubt about their ability to do something like that is going to be a cause of concern for me. Now, is it every single juror that I exercise a peremptory challenge on? I couldn't possibly tell you that, but more times than not, I would.

(E.R. at 54).

With five challenges remaining, Lee did not exercise a challenge on juror 255, a 27-year-old female named J.O. (Tr. Sep. 26, 2006 at 109-13; S.A. at 300). J.O.'s questionnaire indicated that she worked in project management for Beacon Hill Staffing in Boston. (S.A. at 300). Lee testified: "I think when that person or that prospective juror came up, I was down to, I believe, either four or five challenges. She was 27 years old, which I didn't consider to be overly young. She was working. I don't recall what her job was at the time, but I was—probably may have been somebody I might have taken anyway but certainly was going to take given the number of peremptory challenges I had remaining." (E.R. at 15).[3]

Lee exercised his twelfth challenge on juror 261, a 19-year-old black male named A.D. (Tr. Sep. 26, 2006 at 120; S.A. at 284). Eleven of sixteen jurors had been seated at that point. (S.A. at 285-300). According to his questionnaire, A.D. worked for Home Depot and was in his first year of college. (S.A. at 284). During his individual voir dire, A.D. stated that he attended

_____

[3] At one point, Lee mistakenly testified that he "was down to I believe four peremptory challenges" when he chose not to strike J.O. (E.R. at 63).

Northeastern University. (Tr. Sep. 26, 2006 at 119). He answered "no" to all of the judge's

inquiries as to whether he would have any difficulty being a fair and impartial juror. (*Id.* at 116-

19). (*Id.* at 116). Lee exercised a challenge directly after the individual voir dire. (*Id.* at 120).

After Lee indicated his intent to challenge A.D. at sidebar, defense counsel objected on the

basis that "Mr. Lee has, now, exercised [per]emptory challenges against a large number of African

American [jurors]." (Tr. Sep. 26, 2006 at 120). Following a discussion, defense counsel specified

that he was referring to jurors 201, 227, and 246—L.D., P.M., and M.C.—as establishing a pattern

of discrimination. (*Id.* at 129).[4]

In response, Judge Connolly first stated that M.C. should be excluded from consideration,

because "under no circumstances could this man be considered a man of color. In my opinion,

he's a Guatemalan; he's from Central America." (*Id.*). Defense counsel then argued that even

excluding M.C., Judge Connolly should still find a pattern of discrimination based on the fact that

A.D. "would be the third black man challenged out of a total of eight who have been questioned,

so far. So we have three out of a total of eight; which, I say, is a significant percentage." (*Id.* at

132).[5] Judge Connolly then stated: "I just find, after determination and having discussions with

_____

[4] As noted above, L.D.'s questionnaire indicates that he was born in Trinidad. During the discussion among Lee, Judge Connolly, and defense counsel, defense counsel characterized L.D. as a "person of color." (Tr. Sep. 26, 2006 at 122). Neither Judge Connolly nor Lee disputed the characterization. (*Id.* at 122-33). There is, however, some question as to whether he was black, as opposed to (for example) a dark-skinned South Asian or person of mixed race. A substantial majority of the population of Trinidad is of South Asian, African, or mixed African-Asian background. GOV'T OF THE REPUBLIC OF TRINIDAD & TOBAGO, MINISTRY OF PLANNING AND SUSTAINABLE DEVELOPMENT CENTRAL STATISTICAL OFFICE, TRINIDAD & TOBAGO 2011 POPULATION AND HOUSING CENSUS DEMOGRAPHIC REPORT 15 (2012). At the September 2014 hearing, Lee stated that he had no memory as to whether L.D. was in fact dark-skinned. (E.R. at 34-35). For purposes of this opinion, the Court will assume that L.D. was black.

[5] On the present record, there is no way to verify defense counsel's statement that exactly eight black men had undergone the individual voir dire process to that point. The record contains only a small selection of juror questionnaires, and the questionnaires do not directly report a juror's race. However, the jury did ultimately include at least five African-Americans (three women and two men), so it is safe to conclude that Lee chose not to challenge at least five potential jurors who were African-American.

counsel, I make a determination that there has not been shown a pattern of discrimination in this case, under the *Soares* case, at this time."  (*Id.*)[6]

At the September 2014 hearing, Lee was asked directly about his reasoning behind challenging A.D.:

> Q   I want to direct your attention, Mr. Lee, to Juror Number 261.  That was the
>     19-year-old black male juror who attended Northeastern and worked at Home
>     Depot.  Do you recall that juror?
>
> A   Yes.
>
> Q   And did you challenge that juror?
>
> A   I did challenge him.
>
> Q   What was the basis?  What is the basis for that challenge?
>
> A   His age.

(E.R. at 11).  He later added:  "I struck [A.D.] because he was age 19, and I didn't see anything else on his questionnaire that would give me reason to believe that he had a maturity level greater than that of an age 19-year-old person."  (E.R. at 62).  Speaking to his decision to challenge the 19-year-old A.D. after not challenging the 21-year-old I.R., Lee stated:

> I don't even know what [A.D.'s] race was, to be perfectly truthful, I just know that at
> age 19, if I was going to draw a distinction between him and [I.R.], that was the
> distinction I was going to draw, and, as I said, I didn't see anything on his
> questionnaire that would allow me to distinguish him in any way, and so, therefore, I,
> out of concern for, again, the number of jurors that still needed to be selected, by the
> time I got to Mr. [A.D.] , I was down to four challenges, and I thought that I should

---

[6] Judge Connolly was referring to *Commonwealth v. Soares*, 377 Mass. 461 (1979), which the Court of Appeals referred to as "the bedrock Massachusetts case in this area."  *Sanchez*, 753 F.3d at 287 n.5.  In *Soares* (which predated *Batson*), the Massachusetts high court held that the Massachusetts Constitution proscribes "the use of peremptory challenges to exclude prospective jurors solely by virtue of their membership in, or affiliation with, particular, defined groupings in the community" and later specified that "blacks constitute a discrete group" for purposes of that proscription.  *Id.* at 486, 488.  The court considered this rule to be necessary in order to effectuate the right of the accused to be subject only to "the judgment of his peers."  *Id.* at 477 (quoting Mass. Const. pt. 1, art. XII).

exercise a challenge against him at that point.

(E.R. at 61).[7]

With three remaining challenges, Lee did not challenge a 26-year-old woman named J.F. (juror 293). (*Id.* at 155; S.A. at 295). J.F. indicated on her questionnaire that she was a college graduate and that she worked as a "provider account manager" for Tufts Health Plan in Watertown. (S.A. at 295). At the September 2014 hearing, Lee was asked why he did not strike J.F. He responded: "I believe that woman was a college graduate, and I believe that at that point I was down to three peremptory challenges, and based up on what I was seeing coming up, I felt I needed to preserve what few peremptory challenges I had." (E.R. at 16).

With two challenges remaining, Lee did not challenge a 23-year-old (apparently Hispanic) woman named M.P. (juror 333). (Tr. Sep. 26, 2006 at 206; S.A. at 299). M.P.'s questionnaire indicated that she had completed college and was employed as a secretary for the Venezuelan consulate in Boston. (S.A. at 299). It further indicated that she had worked for the probation department of the Suffolk Superior Court in high school. (*Id.*). As to his reasoning in allowing M.P. to remain on the jury, Lee testified: "It was the same reason, which I believe I was down to three challenges at that point as well."[8] (E.R. at 16-17). He further testified that, while he could not specifically recall how many challenges defense counsel had remaining, the number "did play a role" in his thinking. (*Id.* at 17). M.P. was the sixteenth and final juror seated. (Tr. Sep. 26, 2006 at 207-09).

---

[7]As this was Lee's twelfth challenge, he in fact had five challenges remaining as of the time he challenged A.D. *See Sanchez*, 753 F.3d at 286.

[8] Lee had challenged one other juror between J.F. and M.P., so in fact he had only two challenges remaining. (Tr. Sep. 26, 2006 at 185).

The jury included at least five African-Americans, two of whom were men; one was 51 and the other was 34. (S.A. at 25).

At the conclusion of Lee's testimony at the September 2014 hearing, he was asked by the Court whether he remembered anything else about the prospective jurors, such as their "physical appearance, clothing, demeanor, what they were holding in their hands, anything like that." (E.R. at 65-66). Lee responded that he did not. (*Id.*).

The jury empanelment took place in September 2006. The evidentiary hearing took place nearly eight years later, in September 2014. The evidence was thus subject to "the usual risks of imprecision and distortion from the passage of time." *Miller-El v. Cockrell*, 537 U.S. 322, 343 (2003). Nonetheless, the Court found Lee to be credible in all respects. His demeanor was professional and credible throughout. His testimony was based in part on memory and in part on his routine empanelment practices, and he endeavored to distinguish between the two as he testified. His testimony was subject to extensive cross-examination. Petitioner did not call any witnesses. Jonathan Shapiro, the defense counsel who had represented Sanchez at the trial, did not testify.

II.    **Analysis**

A.    **The *Batson* Standard**

The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination against certain cognizable groups in the process of jury selection. "Indeed, the Constitution forbids striking . . . even a single prospective juror for a discriminatory purpose." *Sanchez*, 753 F.3d at 284 (internal quotation marks omitted) (citing *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). Factors that prosecutors may not consider in exercising their peremptory challenges include gender and race. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994); *Batson v. Kentucky*, 476 U.S. 79, 86-87 (1986).

"Although the Fourteenth Amendment does not provide a defendant with a 'right to a petit jury composed in whole or in part of persons of his own race . . . [a] defendant does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.'" *Sanchez*, 753 F.3d at 290 (quoting *Batson*, 476 U.S. at 85-86 (internal quotation marks omitted)). Accordingly, a criminal defendant has standing to raise an equal-protection issue where a juror may have been the subject of a discriminatory challenge. *See Campbell v. Louisiana*, 523 U.S. 392 (1998).

When a defendant asserts that a prosecutor has used a peremptory challenge in a racially discriminatory manner, *Batson* instructs the trial judge to follow a three-step inquiry. 476 U.S. at 96-98. "The moving party bears the initial burden of demonstrating a *prima facie* case of discrimination. If this burden is met, the non-moving party must then offer a non-discriminatory reason for striking the potential juror." *Aspen v. Bissonnette*, 480 F.3d 571, 574 (1st Cir. 2007) (citing *Batson*, 476 U.S. at 96-98). The trial court must then determine "if the moving party has

met its ultimate burden of persuasion that the peremptory challenge was exercised for a discriminatory reason." *Id.*

"[I]n considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (citing *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005). Ultimately, the "critical question" is whether the trial court finds "the prosecutor's race-neutral explanations to be credible." *Miller-El*, 537 U.S. at 338-39. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id.* at 339.

A *Batson* violation may be established if race forms any part of the reason for a peremptory challenge. As the Court of Appeals noted, "the use of a constitutionally neutral characteristic—such as age—in a racially discriminatory manner constitutes race-based discrimination." *Sanchez*, 753 F.3d at 306. Thus, if a prosecutor strikes a juror because he was young *and* black (or young, male, *and* black), as opposed to simply striking him because he was young, a constitutional violation has occurred.

**B.      The First and Second Steps under *Batson***

The Court of Appeals held that petitioner met his initial burden of demonstrating a *prima facie* case of discrimination. It then directed this Court as follows:

> [The district] court should attempt to conduct the second and third *Batson* steps. It should require the prosecutor to explain his challenge[]. If the prosecutor offers a race-neutral explanation, the court must try to evaluate that explanation and decide whether defendant has proved purposeful racial discrimination. If the court finds that, due to the passage of time or any other reason, it cannot adequately address the issues at this stage or make a reliable determination, or if it determines that the

prosecutor exercised his peremptory challenges improperly, it should set the case for a new trial. If it finds the prosecutor exercised his peremptory challenge[] in a permissible fashion, it should [affirm] the judgment.

*Sanchez v. Roden*, 753 F.3d at 308 (alteration in original) (quoting *People v. Johnson*, 136 P.3d 804 (Cal. 2006)). The Court of Appeals also found that "Sanchez waived any objection to the Commonwealth's peremptory strikes against Jurors No. 201 and 227 by failing to object to those strikes at the time they were exercised." *Sanchez*, 753 F.3d at 295 n.10. Thus, the specific peremptory challenge to be evaluated is that exercised by Lee on juror 261.

The second *Batson* step is relatively easy to resolve. "The second step of th[e *Batson*] process does not demand an explanation that is persuasive, or even plausible. At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (alteration in original) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (internal quotation marks omitted). At the motion hearing of September 8, 2014, Lee offered a non-discriminatory, race-neutral explanation for challenging A.D.: "[h]is age." (E.R. at 11). Lee testified on multiple occasions that he struck A.D. due to his age, and because he "didn't see anything else on his questionnaire that would give me reason to believe that he had a maturity level greater than that of an age 19-year-old person." (E.R. at 62). Age is a facially valid, race-neutral consideration and a permissible ground on which to exercise a peremptory challenge under *Batson*. *See, e.g.*, *United States v. Helmstetter*, 479 F.3d 750, 753-54 (10th Cir. 2007) (noting that "every other circuit to address the issue has rejected the argument that jury-selection procedures discriminating on the basis of age violate equal protection"); *Cresta*, 825 F.2d at 544-45. Accordingly, this explanation satisfies the government's

burden under the second step of *Batson*.

## C.     **The Third Step under *Batson***

The third step of the *Batson* test requires this Court to evaluate the race-neutral explanation and determine whether the petitioner has "met [his] ultimate burden of persuasion that the peremptory challenge was exercised for a discriminatory reason." *Aspen*, 480 F.3d at 574. Making that determination involves "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" and consideration of "all relevant circumstances." *United States v. Mensah*, 737 F.3d 789, 797 (1st Cir. 2013) (quoting *Batson*, 476 U.S. at 93, 96). Ultimately, the "critical question" is whether the trial court finds "the prosecutor's race-neutral explanations to be credible." *Miller-El*, 537 U.S. at 338-39. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id.* at 339.

Lee stated unequivocally at the September 2014 hearing that he struck juror 261 as a result of his age. He gave no alternate justification, although he did supplement his reasoning by explaining that he also evaluated juror 261's questionnaire and found no "reason to believe that he had a maturity level greater than that of an age 19-year-old person." (E.R. at 62). Thus, the "critical question" is whether Lee's explanation is credible—that is, whether he indeed struck juror 261 due to his youth, or whether he impermissibly struck him, in whole or in part, due to his race.

### 1.     **Discrimination on the Basis of Youth in Jury Selection**

As a general matter, discrimination on the basis of race is prohibited, but discrimination on

the basis of youth is not.[9]  Our legal system and our society routinely discriminate against

individuals on the basis of their youth.  For example, persons under a certain age, typically 16,

cannot drive automobiles.  *E.g.*, MASS. GEN. LAWS ch. 90, § 10.  Persons under the age of 18

generally cannot vote.  *E.g.*, MASS. GEN. LAWS ch. 51, § 1; *see Oregon v. Mitchell*, 400 U.S. 112

(1970).  They also cannot serve as jurors.  *See* 28 U.S.C. § 1865.  Persons under the age of 21

cannot purchase alcoholic beverages.  26 U.S.C. § 158.  Persons under the age of 25 seeking to

rent a car are commonly forced to pay a substantial surcharge, and are often blocked from renting

one at all.  *See* Lisa Fritscher, *Age Requirement to Rent a Car*, USA TODAY,

http://traveltips.usatoday.com/age-requirement-rent-car-62294.html.  Indeed, the Constitution

itself includes a form of youth discrimination:  it requires that representatives be 25 years of age,

senators 30, and presidents 35.  U.S. CONST. art. I, §§ 2, 3; art. II, § 1.

     Of course, those restrictions are based on generalizations that may be false in specific

instances.  A 17-year-old could well prove to be an excellent juror, just as a 24-year-old could be

an excellent driver.  Nonetheless, those generalizations are deeply rooted in experience and

common sense, particularly the basic proposition that as people grow older they are more likely to

mature and gain experience, and that with maturity and experience they are more likely to exercise

their duties and privileges responsibly.

     Moreover, age is not a binary metric.  A person is not "young" at one point and suddenly

"not young" at another.  While it is common to use somewhat arbitrary age cut-offs in a variety of

contexts, in reality no such bright lines exist.  Perhaps more importantly, there is commonly a vast

---

[9] Referring to the issue as "age" discrimination somewhat clouds the inquiry, as that term also applies to discrimination against older persons.  *See*, *e.g.*, the Age Discrimination in Employment Act, 29 U.S.C. § 621 et. seq. (prohibiting discrimination against persons over the age of 40).  For that reason, this opinion will generally use the term "youth" rather than "age."

17

gulf between the experience and maturity levels of very young adults and those even a few years older. Most people change and mature considerably from 18 to 21, and the difference between 18-year-olds and 27-year-olds is usually even more stark. Again, generalizations are always subject to exceptions, and without question there are mature 18-year-olds and immature 27-year-olds. But the distinction between very young adults and slightly older ones—which, again, the law recognizes in multiple respects—is nonetheless perfectly sensible and practical, and one that is routinely observed in a variety of contexts.

For those reasons, among others, prosecutors have frequently sought to exercise peremptory challenges against youthful jurors on the ground that they may not have the necessary maturity and experience to make a difficult decision wisely. *See, e.g.*, *Phase 2 of Jury Selection Set to Begin in Boston Marathon Bombing Trial*, FOX NEWS (Jan. 15, 2015), http://www.foxnews.com/us/2015/01/15/judge-to-question-prospective-jurors-for-trial-boston-marathon-bombing-suspect/ (quoting a former federal prosecutor and current criminal defense attorney on the subject of jury empanelment in the Boston Marathon bombing trial: "As a prosecutor, you want to have somebody who is adult, grown-up, had some experience in life, perhaps has some ups and downs, someone who understands that actions have consequences, and they've had exposure to making tough decisions."). The sheer number of courts to have been faced with the issue of youth-based peremptory challenges by prosecutors is evidence that the strategy is commonplace. *See Helmstetter*, 479 F.3d at 754 (listing cases).

That strategy has also withstood multiple legal challenges. Every Court of Appeals to have considered the question has held that age is an acceptable race-neutral justification for exercising a peremptory challenge. *See Helmstetter*, 479 F.3d at 753-54 (collecting cases). Many of those

cases have specifically upheld peremptory challenges based on the youth of the potential jurors.

*See, e.g., United States v. Bryce*, 208 F.3d 346, 350 n.3 (2d Cir. 2000) (upholding challenge of prospective juror who was the only African-American in the pool, but also its youngest member; the prosecutor alleged that his primary motivation for the strike was the juror's age and "lack of life experience"); *United States v. Maxwell*, 160 F.3d 1071, 1075-76 (6th Cir. 1998); *United States v. Pichay*, 986 F.2d 1259, 1260 (9th Cir. 1993). The First Circuit has specifically held that *Batson* does not prohibit the systematic exclusion of "young adults," which the defendants in that case had defined as persons between the ages of 18 and 34. *United States v. Cresta*, 825 F.2d 538, 544-45 (1st Cir. 1987); *see Barber v. Ponte*, 772 F. 2d 982, 996-1000 (1st Cir. 1985) (en banc).

## 2.     The Dynamic of Exercising Peremptory Challenges

A prosecutor's strategy in selecting jurors is also affected by the manner in which courts permit the exercise of peremptory challenges.[10] Here, the trial court required peremptory challenges to be exercised one by one, as each prospective juror was called forward. Both sides were limited to 16 challenges. Both sides had a limited amount of information as to each prospective juror; counsel relied substantially on the one-page questionnaires and the responses to the statutory and voir dire questions.[11] Furthermore, it is fair to assume that each challenge had to

---

[10] Peremptory challenges permit the parties some limited ability to exercise a veto over prospective jurors, without having to articulate their reasons for doing so. They are often criticized on the ground that they tend to be based on generalizations or even stereotypes (subject, of course, to the restrictions of *Batson*). But the proposition that all potential jurors who (1) meet the minimum qualifications and (2) are not struck for cause will perform their duties wisely and responsibly is itself based on a generalization, and an inaccurate one at that. Peremptory challenges permit both parties an opportunity to strike a handful of potential jurors that they believe will be least helpful or sympathetic to their cause. Among their many virtues is that they substantially increase the likelihood that the jury will be fair, impartial, and responsible, both in reality and in the perception of the parties.

[11] During the September 2014 hearing, both counsel for petitioner and Lee referred to the questionnaires as containing "bare bones" information. (E.R. at 21.) Counsel for petitioner and Lee then had the following exchange:

Q    And is it also fair to say that the statutory questions also are relatively bare bones, that is, the statutory questions that are used to weed out the most obvious prejudices?

be exercised in a limited amount of time and that the prosecutor and defense counsel were generally working at cross-purposes. The record also indicates that both sets of counsel knew relatively little about the prospective jurors in the pipeline—that is, the candidates who would be next up if a challenge were exercised. It appears that counsel had the questionnaire for each juror and little else.[12]

The peremptory challenges in this case were thus exercised under dynamic and fluid circumstances. Every time a challenge was exercised, at least two things happened: a new prospective juror was called forward, and one side lost one of its sixteen challenges. The number of remaining challenges was thus constantly dwindling, but no new information as to the

---

| A | The jury [e]mpanelment questions that are asked by statute, yes, I don't consider them to be particularly detailed. |

(E.R. at 21-22).

[12] During the September 2014 hearing, counsel for petitioner and Lee had the following exchange in reference to his practice while conducting the individual voir dire:

| Q | As you're turning around and looking at who's seated in the venire, actually you can't see who's seated in the venire at that point? |

| A | Right. I don't even know if they are in there. . . . I'm not 100 percent certain, but what I do know is I had the stack of questionnaires in front of me of jurors who had not yet been brought to the sidebar. |

| Q | And you told us, you've already told us that you don't get a lot of time to look at those questionnaires? |

| A | Correct. |

|  | . . . |

| Q | So the questionnaires only gives [sic] you the roughest possible sense of who somebody is and what they might be like as a juror? |

| A | Yes. I mean, it gives—it gives you what it gives you. There's a limited number of questions on the questionnaire. It's one page long, and you try to draw as many conclusions as you can from the information you're given. |

(E.R. at 46-47).

prospective jurors in the pipeline was provided.  Each side therefore had an incentive to use each

succeeding challenge more carefully, or even hold challenges in reserve, in order to ensure that

challenges would remain available to use against the later (largely unknown) candidates.

Moreover, the ease with which challenges were exercised was necessarily affected by the number

of jurors seated and the number of challenges that had been used by opposing counsel.  Typically,

counsel might choose to be more free with the exercising of challenges at the outset, but less so

over time if many seats remain open and opposing counsel has many challenges remaining.

### 3.     Whether the Prosecutor Impermissibly Discriminated on the Basis of Race

The Court turns next to the dispositive issue in this case:  whether Lee struck juror 261, a

19-year-old black male, because of his youth, and not (even in part) because of his race.  Again,

the "critical question" is whether the Court finds "the prosecutor's race-neutral explanations to be

credible."  *Miller-El*, 537 U.S. at 338-39.   In making that determination, the Court may consider,

among other things, the prosecutor's demeanor, the reasonableness or unreasonableness of his

explanations, and "whether the proffered rationale has some basis in accepted trial strategy."  *Id.* at

339.  The overall percentage of eligible black jurors who were struck by the prosecutor is also

relevant to that determination.  *Id.* at 331 (stating that the percentage of black jurors removed by

peremptory strikes is "relevant" to the credibility inquiry).

Petitioner contends that Lee could not have struck juror 261 on the basis of youth because

he chose not to strike other young jurors.  In particular, petitioner points to the fact that Lee did not

strike juror 243 (the 21-year-old white male born in Russia) and jurors 255, 293, and 333 (three

white or Hispanic females aged 27, 26, and 23, respectively).  In addition, petitioner notes that Lee

struck two other dark-skinned young men:  juror 201, the 25-year-old from Trinidad, and juror

227, the 24-year-old black male.  Petitioner contends that this inconsistency proves that Lee challenged juror 261 not simply because he was young, but because he was a young, black male.

Petitioner's claim of racial bias thus depends almost entirely on the alleged inconsistency: if Lee were telling the truth, the argument goes, he would have struck the 21-year-old Russian-American, and indeed struck all the youngest jurors.  The Court is satisfied, however, that Lee's explanation for his challenges is entirely credible and that the claimed inconsistency does not prove otherwise.

First, and as noted, every person under the age of 30 should not be swept into a category called "young," without accounting for the huge distinctions between members of that group.  A 19-year-old and a 27-year-old may both qualify as "young" for some purposes, but to a lawyer exercising a peremptory challenge, the 27-year-old is far more likely to be mature, experienced, and responsible than the 19-year-old.  Here, there were two prospective jurors under the age of 20: juror 229 (a 19-year-old white male) and juror 261 (a 19-year-old black male).  Lee struck them both.  There were also two prospective "young" jurors over the age of 25:  juror 255 (a 27-year-old white female) and juror 293 (a 26-year-old white female).  Lee kept them both.[13]

Second, every potential juror presented for questioning at a different time and under different circumstances.  Again, when exercising a challenge, an attorney must consider not just the individual characteristics of each potential juror, but also factors such as the number of challenges remaining (both for oneself and for one's opponent), the number of jury seats to be filled, and the list of jurors to come.  A juror who presents early in the process, when a prosecutor

---

[13] As to juror 255, Lee testified:  "She was 27 years old, which I didn't consider to be overly young."  (E.R. at 15).

is holding more challenges, may be struck more readily than one with the same profile who presents at a time when the prosecutor has few challenges remaining. Under the circumstances, at least some minor inconsistencies are to be expected.

Viewed in that light, Lee's explanation for his decision to challenge jurors 201 and 227 (the 25-year-old male from Trinidad and the 24-year-old black male), and not to challenge jurors 293 and 333 (the 26-year-old white female and 23-year-old Hispanic female), is reasonable and race-neutral. Lee still had twelve peremptory challenges when he challenged juror 201 and ten when he challenged juror 227.[14] By contrast, he had just three challenges when he chose not to challenge juror 293 and only two when he chose not to challenge juror 333. For that reason, he had substantially more flexibility when considering jurors 201 and 227 than when considering jurors 293 and 333.[15]

Third, while chronological age is a proxy for maturity and experience, it need not be treated as a rigid requirement that trumps all other factors. The principal instance in which Lee allegedly acted inconsistently came with respect to jurors 243 (the 21-year-old white male college student who had been born in Russia, whom he kept) and 261 (the 19-year-old black male college student, whom he struck). Petitioner contends that the *only* meaningful difference between these two potential jurors is their race. Indeed, the Court of Appeals specifically relied on Lee's apparently differential treatment of these two jurors to find *prima facie* evidence of racial

---

[14] After using his seventh challenge to strike juror 227 (the 24-year-old black male), Lee used his eighth challenge to strike juror 229 (the 19-year-old white college student) (juror 228 was excused for cause). Lee thus considered two "young" males in close succession—one black, one white—and reached the same decision on both.

[15] There were additional factors at work, as well, in choosing among those four jurors. The two jurors who were struck appeared to have less formal education than the two who were kept. Lee testified that he chose not to challenge juror 293 in part because her questionnaire indicated that she was a college graduate. (E.R. at 16). Juror 333 also completed college. (S.A. at 299). By contrast, juror 227's highest level of education was a GED. Juror 201 did not indicate his level of education on his questionnaire.

discrimination.  *Sanchez*, 753 F.3d at 304.

Lee testified at the September 2014 hearing that while his "inclination was to strike" juror 243, he ultimately chose not to due to "indications on [his] questionnaire that might make [h]im not fit [his] chronological age." (E.R. at 13).  He testified that because juror 243 was born in Moscow and had moved to the United States prior to starting his college education, he thought he "may have been chronologically a little bit older than someone else in terms of life experiences, and that's really what I'm looking at that somebody who has some level of maturity and life experience." (E.R. at 44).  He also testified:  "I thought if I had to take a young juror, that would be somebody who might be a better candidate than most." (E.R. at 13).  By contrast, he testified that as to juror 261, he "didn't see anything else on his questionnaire that would give me reason to believe that he had a maturity level greater than that of an age 19-year-old person." (E.R. at 62).

That race-neutral explanation, under the circumstances presented here, is reasonable and credible.  Again, a prosecutor who seeks to exclude jurors on the basis of youth is likely using age as a proxy for two things:  maturity and life experience.  Those are exactly the two factors referred to by Lee in his testimony.  Juror 243 was two years older than juror 261, and had experience living in two different countries, including one with a different language and culture than the United States.  Lee plausibly assumed—perhaps correctly, perhaps not— that Juror 243 came to the United States "on his own" and "to begin his education."  It was not unreasonable for Lee to infer that an individual in juror 243's position was likely to have greater life experience and maturity than an individual in juror 261's position.

That does not, of course, mean that Lee's assumptions are factually correct; the 21-year-old Russian-American immigrant might well prove to be less mature than the 19-year-old African-

American. There was no way for Lee to know for certain either way. And another person might have drawn a different conclusion. But the issue is neither the accuracy nor the universality of the assumption; it is the credibility of the prosecutor's explanation. *See Aleman v. Uribe*, 723 F.3d 976, 982 (9th Cir. 2013) (" . . . the court need not believe that the stated reason represents a sound strategic judgment to find the prosecutor's rational persuasive; rather, it need be convinced only that the justification should be believed."). That explanation was credible, and petitioner has not shown otherwise.

Petitioner further contends that Lee should have been more likely to strike juror 243 than 261, because Lee had more challenges remaining when he considered juror 243 than when he considered juror 261. But the number of challenges remaining is not the only relevant consideration; the number of jurors left to be seated necessarily plays a role as well. For example, an attorney with four challenges remaining and only one juror left to be seated has more flexibility than one with five challenges remaining and twelve jurors left to be seated. Here, Lee had six challenges remaining with eight jurors left to be seated when he considered juror 243. When he considered juror 261, he had five challenges remaining with five jurors left to be seated.[16] Thus, his ratio of challenges remaining to open jury seats was actually slightly better when he considered juror 261 than when he considered juror 243. Regardless, the numbers are close, and that factor is not dispositive in either direction.

Finally, because the ultimate question is whether the prosecutor's intent (in whole or in part) was racially motivated, his actions as to other African-American prospective jurors are also

---

[16] During the motion hearing of September 8, 2014, counsel for petitioner asked a question implying that no jurors had been seated between juror 243 and juror 261. (E.R. at 61). In fact, jurors 250 and 255 had been seated in between. (Tr. Sep. 26, 2006 at 89-93, 109-14).

relevant.  *Miller-El*, 537 at 331 (stating that the percentage of black jurors removed by prosecutor by peremptory strikes is "relevant" to the credibility inquiry).  Defense counsel stated during his initial *Batson* challenge that Lee had challenged three out of the first eight black men questioned.[13] This statement is not fully verifiable on the record, but it implies that Lee had chosen not to challenge five black men to that point.[16]  (The record is silent as to how many black women were questioned.)  Furthermore, the jury ultimately included three black women and two black men. Lee thus apparently did not strike at least eight of eleven potential jurors who were black:  the three black women on the jury plus the five black men who defense counsel said that Lee had not challenged.  Indeed, even if defense counsel's statement is ignored as unverifiable, Lee necessarily did not challenge the five African-Americans who ended up on the jury.

Again, the fact that Lee did not challenge some black jury members is not by itself dispositive.  *Batson* prohibits prosecutors from exercising even a single challenge on the basis of race.  476 U.S. at 86-88; *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir. 1987).  But just as Lee's decision not to challenge some white jurors is relevant circumstantial evidence to the question of his intent in striking juror 261, so is his decision not to challenge at least five black jurors.  *See United States v. Briscoe*, 896 F.2d 1476, 1489 (7th Cir. 1990).

Petitioner also cites Lee's challenge of juror 246, the 41-year-old Guatemalan-American man, as further evidence of his tendency to strike jurors based on race.  There is no evidence,

---

[13] Defense counsel excluded juror 246 (the 41-year-old Guatemalan-American male) from consideration; during a sidebar conference that took place during the questioning of juror 261, he stated as follows:  "[E]ven if you take out [juror 246], the Guatemalan, this gentlemen in the box, now, would be the third black man challenged out of a total of eight who have been questioned, so far."  (Tr. Sep. 26, 2006 at 132).

[16]  The statement was made by the proponent of the *Batson* challenge, so there is no reason to believe that the number cited was overly generous to Lee.

however, that juror 246 was black; Judge Connolly observed that "under no circumstances could [he] be considered a man of color."  Status as a "minority" is not a cognizable group under *Batson*. *Gray v. Brady*, 592 F.3d 296, 302 (1st Cir. 2010).  Furthermore, and in any event, juror 246 was far more equivocal than the other jurors in responding to the judge's questions about whether he could be fair as a juror.  When asked if there was any question in his mind as to whether he could be fair, juror 246 responded: "Just that the responsibility—I mean, no, no."  (Tr. Sep. 26, 2006 at 73-74).  The transcript reflects that Lee immediately asked Judge Connolly (at sidebar) to follow up on that line of questioning, and that after further questioning he exercised a challenge.  (*Id.* at 74-76).  At the September 2014 hearing, Lee testified:  "I exercised a challenge against [juror 246] because in response to one of the questions, he expressed concern about the responsibility of being a juror.  That is, what I consider—what he suggested was an overwhelming responsibility that he didn't know what he could meet."  (E.R. at 53).  On the record, Lee's rationale behind striking juror 246 seems clearly related to his hesitation in agreeing that he could be fair and not any race-based consideration.  Moreover, juror 246 was 41 years old.  He is thus outside the category of "young, black men" regardless of his race.[17]  Lee's challenge of juror 246 thus adds little, if any, weight to petitioner's argument.

In sum, petitioner's *Batson* claim falls short at the third step of the analysis.  Petitioner has not met its burden of persuasion that the government used its peremptory challenge on juror 261 on a discriminatory basis.  The Court credits Lee's testimony that he struck juror 261 (and other young jurors, both black and white) for appropriate, race-neutral reasons based largely on age, and

_____

[17] Lee also kept juror 333, a 23-year-old apparently Hispanic female, on the jury.  It is unclear whether any other Hispanic jurors were questioned.

that he chose not to strike some young jurors for similarly appropriate reasons. Accordingly, the

petition for habeas relief will be denied.

**III.** **Conclusion**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: February 4, 2015